UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

GILBERTO RIOS,

          Plaintiff,

    -against-

CORE FACILITY SERVICES LLC,
MERIDIAN MANAGEMENT
CORPORATION, and GREG
BASSIGNANI,[1] individually,

          Defendants.

-------------------------------------------------------x



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 29 2018 ★
BROOKLYN OFFICE

<u>NOT FOR PUBLICATION</u>
**MEMORANDUM & ORDER**
16-CV-1748 (CBA) (JO)

**AMON, United States District Judge:**

Plaintiff Gilberto Rios ("Rios") filed the instant action against Defendants Core Facility Services LLC ("Core"), Meridian Management Corporation ("Meridian"), and Greg Bassignani ("Bassignani"), asserting disability discrimination claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 <u>et seq.</u>; Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 <u>et seq.</u>; and the New York City Human Rights Law ("NYCHRL"), N.Y. Comp. Codes R. & Regs. tit. 8, § 101 <u>et seq.</u>[2] (<u>See</u> Am. Compl.) Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, Rios voluntarily dismissed his claims without prejudice against Meridian. (D.E. # 29.) Core and Bassignani answered the Amended Complaint, (D.E. # 25), and the parties completed discovery on March 13, 2017, (<u>see</u> D.E. # 39–40). Now before the Court is Core and Bassignani's joint motion for summary judgment on all claims, pursuant to

---

[1] In his Amended Complaint, Plaintiff Gilberto Rios named "Greg Bassinani" as a Defendant. (<u>See generally</u> Am. Compl., D.E. # 20.) The plaintiff has not filed a motion to amend the caption but, in his opposition brief to the instant summary judgment motion, referred to Greg Bassinani repeatedly as Greg "Bassignani." (<u>See, e.g.</u>, Pl. Br. at 4, D.E. # 50 at 11.) The Court treats the brief as a motion for leave to amend the caption from "Greg Bassinani" to "Greg Bassignani," and the Court finds that the plaintiff has satisfied the requirements for Rule 15 of the Federal Rules of Civil Procedure. <u>See</u> Fed. R. Civ. P. 15(a) (noting that leave to amend "shall be freely given when justice so requires").

[2] The Amended Complaint also asserted a claim under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. (Am. Compl. ¶ 80.) However, Rios has abandoned the claim. (<u>See</u> Pl. Br. at 22 n.1.)

Rule 56 of the Federal Rules of Civil Procedure. (D.E. # 51.) For the reasons set forth below, the Court grants the motion in part and denies it in part.

## BACKGROUND

The Court draws its facts from the "cited materials" in the summary judgment briefing. Fed. R. Civ. P. 56(c)(1), 56(c)(3).[3] The Court largely does not rely on the assertions in the parties' Rule 56.1 statements and responses,[4] which were most unhelpful. Some assertions were virtually or totally unsupported by the citations. In at least one instance, a purported quotation was nowhere to be found in the offered citation.[5] "[A] Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 132–33 (2d Cir. 2008).

Of the cited materials, the Court considers the affidavits to the extent they are "made on personal knowledge," "set forth such facts as would be admissible in evidence," and "show affirmatively that the affiant is competent to testify."[6] Fed. R. Civ. P. 56(e). Otherwise, the

---

[3] (See also Defs.' Local Rule 56.1 Statement ("C&B Defs. 56.1"), D.E. # 54; Pl.'s Resp. to Defs.' Rule 56.1 Statement of Undisputed Material Facts, D.E. # 50-2 at 1–37; Defs.' Resp. to Pl.'s Local Rule 56.1 Opp. ("C&B Defs. Reply 56.1"), D.E. # 53-1 at 1–52; Counter 56.1 Statements ("Pl. 56.1"), D.E. # 50-2 at 37–44; Defs.' Resp. to Pl.'s Rule 56.1 Counter Statement of Additional Material Facts, D.E. # 53-1 at 53–69.)

[4] The Court rejects Rios' request to strike Defendants' Rule 56.1 statement for failing to comply with Local Rule 56.1. (See Pl. Br. at 2–3.) The rule requires Defendants to provide "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). Rios contends that only 16 of the 58 paragraphs in Defendants' Rule 56.1 statement are "separate, short and concise." (Pl. Br. at 2.) This argument verges on the frivolous; the Local Rule requires the "statement," not each individual paragraph, to be "separate, short and concise."

[5] Core and Bassignani incorrectly cited to Lines 117:10 to 118:2 of Rios' deposition for the following quote: "Q. After you had surgery, did you feel better? A. Yes, I feel like I am young." (See C&B Defs. Reply 56.1 ¶ 53.)

[6] The Court considers Bassignani's affidavit, (C&B Defs. 56.1, Ex. MM ("Bassignani Aff."), D.E. # 54-39), and Rios' unsworn declaration, (Decl. of Gilberto Rios ("Pl. Decl."), D.E. # 50-1), the latter of which "substantially compl[ies]" with 28 U.S.C. § 1746, LeBeouf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 66 (2d Cir. 1999), to the extent that the two filings "clarif[y]" the parties' "ambiguous or incomplete deposition testimony" and do not "contradict[]" their prior testimony, Figueroa v. Mazza, 825 F.3d 89, 109 n.15 (2d Cir. 2016).

2

materials "need be considered only to the extent that [they] would have been admissible at trial." Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

The Court "constru[es] the evidence in the light most favorable to" Rios and draws "all reasonable inferences in [his] favor." Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017). In turn, the Court describes the parties, the disputed facts concerning his leave and termination, and the procedural posture of this case.

## I. The Parties

Core manages and operates commercial real estate facilities and now serves as manager and operator of numerous facilities at John F. Kennedy International Airport ("JFK"). (Bassignani Dep.[7] at 26:7–18; Core 30(b)(6) Dep.[8] at 14:4–25; see also JFK Contract[9] at D-526 to -527.) As Core's vice president, Bassignani oversees personnel and field operations and ensures that Core fulfill its contractual obligations. (Bassignani Dep. at 23:7–9; JFK Contract at D-561; Bassignani Aff. ¶¶ 4–5.) He also obtains clients for Core through public bids. (Bassignani Dep. at 27:21–25.) However, he does not supervise or control worker schedules or conditions, does not set pay for the workers, and does not maintain employment records. (Bassignani Aff. ¶¶ 6–8.) Also at Core, non-parties Christopher DiLeone ("DiLeone") serves as president, and John Ciofalo ("Ciofalo") as senior operations director, whose duties include site management. (Bassignani Dep. at 46:25–47:4; Core 30(b)(6) Dep.[10] at 12:9–11; JFK Contract at D-560.)

---

[7] Bassignani's deposition ("Bassignani Dep.") is found at Exhibit A of Core and Bassignani's Rule 56.1 statement, (D.E. # 54-1), and Exhibit 5 of Rios' Declaration of Marjorie Mesidor, (D.E. # 50-8).

[8] Core's deposition under Rule 30(b)(6) of the Federal Rules of Civil Procedure, ("Core 30(b)(6) Dep."), is found at Exhibit B of Core and Bassignani's Rule 56.1 statement, (D.E. # 54-2), and Exhibit 4 of Rios' Declaration of Marjorie Mesidor, (D.E. # 50-7).

[9] The contract at issue in this case ("JFK Contract") is found at Exhibit D of Core and Bassignani's Rule 56.1 statement, (D.E. # 54-4), and Exhibit 8 of Rios' Declaration of Marjorie Mesidor, (D.E. # 50-11 to -13).

[10] Core designated Ciofalo as its deposition witness.

Before Core took over the job, Meridian had served as manager and operator of the JFK facilities. (Core 30(b)(6) Dep. at 14:13–17; 15:2–7; 15:20–25; Hutchinson Dep.[11] at 29:4–9; see also JFK Contract at D-526 to -527.) Meridian employed Rios, who had served as a building mechanic in JFK for at least 11 years and had been the fourth most senior mechanic at the Transport Workers Union of America, Local 504 ("TWU"). (Pl. Dep.[12] at 13:12–14:16, 15:15–20, 28:11–29:2. But see C&B Defs. 56.1, Ex. H ("Application") at D-395 (stating that Rios started work in October 2000), D.E. # 54-8 at 5; Decl. of Marjorie Mesidor ("Mesidor Decl."), Ex. 11 at D-396 to -397, D.E. # 50-16 at 6–7.) Rios performed plumbing and electric work and inspected JFK buildings. (Id. at 21:13–25.) He received health benefits, vacation pay, and sick leave from Meridian. (Id. at 24:11–21.)

On or about December 30, 2014, Core proposed a $38 million bid for a three-year agreement with The Port Authority of New York and New Jersey ("Port Authority") to perform management and operations services for the JFK facilities (the "JFK Contract"). (JFK Contract at D-532, -560, -580, -594; see also Bassignani Dep. at 28:6–14.) Although Core made individual decisions as to whether it wanted to retain employees from prior vendors, Core had a standard practice of hiring most if not all of the prior employees.[13] (Core 30(b)(6) Dep. at 23:24–24:7, 24:13–19.) Accordingly, no later than March 2015, Bassignani and other Core representatives asked then-Meridian employees to fill out tax forms and Core employment forms, the latter of which specified that they were merely applications, not guarantees of employment. (See

---

[11] Non-party Robert Hutchinson's ("Hutchinson's") deposition ("Hutchinson Dep.") is found at Exhibit E of Core and Bassignani's Rule 56.1 statement, (D.E. # 54-5), and Exhibit 6 of Rios' Declaration of Marjorie Mesidor, (D.E. # 50-9).

[12] Rios' deposition ("Pl. Dep.") is found at Exhibit T of Core and Bassignani's Rule 56.1 statement, (D.E. # 54-20), and Exhibit 3 of Rios' Rule 56.1 counterstatement, (D.E. # 50-6).

[13] Indeed, Core hired about 20 Meridian mechanics. (Core 30(b)(6) Dep. at 40:20–25.)

Bassignani Dep. at 44:5–19; Core 30(b)(6) Dep. at 18:18–22; Application at D-396 to -397.) The first page of the employment application packet, which was provided to the Court and authenticated by both sides, indicates as much in both English and Spanish. (See Application at D-392.) Rios signed Core's "Application for Employment," a direct deposit form, a federal W-4 tax form, a federal tax credit form, and a federal immigration form on March 25, 2015. (Id. at D-396 to -397, -407, -410, -412.) On the federal immigration form, Jessy Figueroa ("Figueroa"), an administrator for Core, certified under penalty of perjury on March 27, 2015, that Rios' "first day of employment" was May 1, 2015. (Id. at D-408.)

## II.    Core's Transition Period

On April 14, 2015, the Port Authority notified Core that it had secured the JFK Contract. (JFK Contract at D-526 to -527.) The parties finalized the agreement on April 22, 2015, and the effective start date was May 1, 2015. (Core 30(b)(6) Dep. at 14:4–25; see also JFK Contract at D-526 to -527.) Bassignani testified that Core entered a "transition period" between receiving the Port Authority's April 14, 2015, letter and taking over as manager of the JFK facilities on May 1, 2015. (Bassignani Dep. at 35:8–15, 38:20–23; see also JFK Contract at D-526; Hutchinson Dep. at 37:11–18.) During this period, Bassignani had a uniform company measure the Meridian employees, because Core employees needed to wear the uniforms. (Bassignani Dep. at 61:21–62:13; Core 30(b)(6) Dep. at 25:13–16.) Rios testified that he was measured. (Pl. Dep. at 66:6–11.) Rios also participated in safety training provided by Core to prepare the Meridian employees. (Pl. Dep. at 44:5–12; C&B Defs. 56.1, Ex. M at D-680; Mesidor Decl., Ex. 40 at D-680.) He had his fingerprints taken and prepared for an ID card to be made. (Pl. Dep. at 44:5–12, 50:21–51:6.) Rios successfully received the card; Figueroa stated in an undated "verification" letter that Rios

5

"is a current employee of Core Facility Services" and that his "Port ID is ready to be picked up." (C&B Defs. 56.1, Ex. L at D-677.)

In addition, Bassignani asked the Meridian employees to fill out health benefit forms, so that Core can process them by the May 1, 2015, start date. (Bassignani Dep. at 62:14–63:4; Core 30(b)(6) Dep. at 35:19–36:4.) Core testified at one point that it processed the forms regardless of whether Core retained the Meridian employees. (Core 30(b)(6) Dep. at 36:12–21.) But Core also testified that it gave health benefits "only" to people who were "actually" hired. (Id. at 26:9–11.) The health benefits would not start until May 1, 2015. (Id. at 26:2–11, 36:2–4.) Rios signed one health benefit form on April 23, 2015. (Application at D-413.) Another form was "COMPLETED BY STEPHANIE ANNIS" and signed by Rios on April 29, 2015. (C&B Defs. 56.1, Ex. J at D-21 to -23.)

Finally, Bassignani testified that the "retained" Meridian employees knew to show up on May 1 because, "[a]t some point," he and others notified them that they had a shift on the new work schedule. (Bassignani Dep. at 44:20–25.)

### III. Rios' Hospital Stay

Rios stopped working for Meridian when Core took over, (id. at 29:3–14), and his "last work day" at JFK was April 29, 2015, (Pl. 56.1, Ex. 30 at D-463, D.E. # 50-35). As the Court will discuss below, the parties dispute when and under what circumstances Rios' employment was terminated.

On April 30, 2015, Rios became ill, complained that he could not breathe, and went to a local hospital for emergency surgery. (Pl. Dep. at 44:17–21, 48:9–49:5, 58:24–59:3, 68:18–23.) Core did not know about the illness on April 30, 2015. (Id. at 44:22–24.) Rios stayed at the hospital until the surgery, which took place on May 7, 2015. (Id. at 69:6–16.) At or around that

time, Rios was diagnosed with obstructive coronary artery disease ("OCAD"), (id. at 117:10–14), and given a pacemaker, (Pl. Decl. ¶ 10).[14] Meanwhile, Rios' wife was hospitalized on May 2, 2015, for a respiratory issue and was not released until May 12, 2015. (Id. ¶¶ 7–8.)

## IV. Core's Initial Days

On May 1, 2015, Core took over operations at the JFK facilities. Core signed collective bargaining agreements with at least two unions: TWU, which was Rios' union during his time at Meridian, and International Union of Operating Engineers Local 30. (Core 30(b)(6) Dep. at 26:22–25, 27:2–9; see also Int'l Union of Operating Eng'rs Local 30, About Us, www.iuoelocal30.org/local-30/about-us.aspx.) TWU's collective bargaining agreement, which governs working conditions for mechanics, provides for medical and FMLA leave.[15] (C&B Defs. 56.1, Ex. G at D-2, -7 to -9, -14, D.E. # 54-7.)

The JFK Contract also went into effect. In relevant part, the JFK Contract required Core to furnish competent and adequately trained staff to perform work at JFK. (JFK Contract at D-605.) The agreement further provides:

---

[14] Rios' condition appears to have improved since the hospital visit. He largely recovered within a month following his surgery. (See Pl. Dep. at 125:11–126:22.) Although he makes monthly visits to his doctor for post-surgery checkups, (Pl. Decl. ¶ 9), he no longer has OCAD, (Pl. Dep. at 117:10–21). In addition, since a month after the emergency surgery, Rios has had no trouble working at home, walking, and driving. (Id. at 125:11–126:22.) He also sleeps "like a baby." (Id.)

[15] Rios temporarily received health benefits from Core. On May 18, 2015, Bassignani was told that Rios was one of the "new enrollments." (C&B Defs. 56.1, Ex. O at D-490, D.E. # 54-15 at 2.) Bassignani testified that Rios "was added to the [insurance] policy incorrectly" and "was never covered." (Bassignani Dep. at 154:7–155:22.) Yet in a June 16, 2015, email, Bassignani recognized that Rios' name was on an "employee premiums deductions sheet," and that "we may need to remove this employee from coverage." (C&B Defs. 56.1, Ex. Q at D-359, D.E. # 54-17 at 2.) Rios declared that he and his wife used Core's health insurance from May to August 2015. (Pl. Aff. ¶ 5.)

7

> The Manager shall have the right to determine the total number of staff to be employed by the Contractor under this Agreement. As part of this total, the Port Authority shall establish the number and type of staff to be assigned to operation and/or maintenance activities on each shift, seven (7) days each week, twenty-four (24) hours a day, throughout the year. At any point in time during the term of this Contract, the Port Authority may revise the number and/or type of staff assigned.

(Id.) The JFK Contract defines "Manager" as the "Manager of Airport Maintenance Services Division, JFK Airport." (Id. at D-593.) Bassignani testified that non-party Demetrios Bournias ("Bournias") served as the "manager of maintenance at JFK." (Bassignani Dep. at 107:20–108:2.) Core and Bassignani do not point to anything in the record suggesting that Hutchinson, a chief maintenance supervisor of the Mechanical Group at JFK, (Hutchinson Dep. at 25:3–11), served as the "Manager" in the JFK Contract.

Still, Hutchinson was a primary Port Authority contact for Bassignani. (Bassignani Dep. at 34:15–18; Core 30(b)(6) Dep. at 14:4–25.) Hutchinson testified that he supervised a staff member directly responsible for the JFK Contract. (Hutchinson Dep. at 27:21–28:14, 28:15–20.) With respect to his own role, Hutchinson made sure that the Port Authority was not overbilled and that Core employees showed up for work as was reported in Core's bills. (Id. at 34:21–25, 67:5–68:13.)

The JFK Contract created more positions than there were Core employees to fill them. (Hutchinson Dep. at 114:19–115:8; see also id. at 97:7–13.) To prepare for future budget cuts, Hutchinson requested in or around May 2015 that the open positions not be filled. (Hutchinson Dep. at 58:14–59:12, 59:17–60:5, 84:12–85:2, 115:3–8.) Bassignani testified that, in meetings with him and DiLeone, Hutchinson expressed the Port Authority's budgetary concerns and its need to reduce the workforce. (Bassignani Dep. at 34:2–14, 37:11–16, 38:24–39:9.) At those meetings, Hutchinson asked them to postpone hiring additional employees. (Id. at 41:15–19; see also

8

Hutchinson Dep. at 58:14–59:12, 59:17–60:5.) However, Hutchinson testified that he was not involved with deciding whether employees would continue working at Core, and stated that he never made the decision "not to hire" Rios. (Hutchinson Dep. at 31:24–32:12, 53:17–21.) Hutchinson also testified that he does not recall having a conversation with any Core employee about "hiring" or "rehiring" Rios. (Id. at 88:17–89:6.)

On May 1, 2015, Core was "expecting" Rios. (Core 30(b)(6) Dep. at 50:2–4.) Obviously, he did not show up. Core at some point "reviewed the schedule to see if he had scheduled time off in advance that was approved by Meridian." (Id. at 50:5–9. But see C&B Defs. 56.1, Ex. LL ("Annis Aff.") ¶ 2 ("Meridian . . . removed all employee personnel files prior to Core's contract start date of May 1, 2015."), D.E. # 54-38.) Core determined that Rios was using his vacation days, as was pre-approved by Meridian. (Core 30(b)(6) Dep. at 50:10–18.)

## V. Rios' Notice

The parties dispute to what extent Core and Bassignani knew about Rios' health problems. Core acknowledged receiving notice of Rios' hospitalization on or around May 1, 2015, but does not recall precisely from whom it received the information. (Core 30(b)(6) Dep. at 51:20–52:3.) Core also knew about Rios' heart condition and surgery. (Id. at 48:11–19.) Core does not recall whether Rios ever requested leave under the FMLA. (Id. at 42:17–21.) Bassignani confirms that he learned about Rios' disability leave in or around May 2015. (See Bassignani Dep. at 92:4–12.)

Rios testified that, on or around May 1, 2015, he told Stephanie Annis ("Annis"), Javier Dexter ("Dexter"), Jimmy Galvin ("Galvin"), Charlie Grogan ("Grogan"), Bobby Jean ("Jean"), and Mike Montgomery ("Montgomery") that he was having surgery at the hospital. (Pl. Dep. at 49:6–20, 50:2–14, 63:5–25. But see id. at 55:13–14 (failing to recall when he notified Annis).) According to Rios, he specifically told Grogan and Jean that he had a medical "emergency." (Pl.

Dep. at 69:17–25.) Rios also told Jean that he needed to take a leave. (Id. at 144:15–17.) Although Annis testified that "[a]t no point did Mr. Rios tell [her] he was disabled nor did [she] believe him to be disabled," (Annis Aff. ¶ 4), Rios testified that he told Annis of his OCAD diagnosis, (Pl. Dep. at 149:24–150:9). Rios also testified that he told Annis "to take [his] vacation and [his] sick days so as to—so that [he] could go to the hospital" for an "emergency." (Id. at 54:23–55:8.)

Annis testified that she is a Core employee,[16] (see Annis Aff. ¶ 1), and the JFK Contract reasonably implied that both Galvin and Montgomery were Core supervisors, (see JFK Contract at D-548 to -549, -605 (listing "MM" and "JG" as employees who generally must be retained in the transition from Meridian to Core)). (See also Core 30(b)(6) Dep. at 52:4–14.) Rios testified that Galvin serves as the chief supervisor. (Pl. Dep. at 50:3–8.)

Rios also testified that, sometime during the hospitalization, he called Bassignani to mention the OCAD diagnosis, but that Bassignani "was not even paying attention to me." (Pl. Dep. at 149:6–14.) Rios testified that he never told Bassignani, or anyone on Core's "[m]anagement" team, about OCAD. (Id. at 149:15–17, 151:4–10.) Still, Rios testified that he called Bassignani to request "a certain piece of paper" for "family medical leave," and that Bassignani declined to give him the form. (Id. at 26:12–27:2; see also id. at 79:24–80:6 (describing similar conversation with unnamed Core employee).)

On or before May 11, 2015, Annis had a phone conversation with Bassignani about Rios' "disability." (C&B Defs. 56.1, Ex. W at D-503, D.E. # 54-23 at 2.) In an email dated May 11, 2015, she told Bassignani to "disregard" the conversation because Rios' disability leave started "[p]rior to starting here with Core." (Id. (emphasis added).) Fourteen minutes later, Bassignani responded in a high-priority email:

---

[16] Annis is only an administrator, not a supervisor, at Core. (See Core 30(b)(6) Dep. at 57:3–6.)

> If he was out prior to, then it's on their watch. Please provide [Rios] with Meridian[']s information and stay removed from the situation from that point. While we want to assist [Rios,] we also don't want to cross any lines or really be in communication with the former contractor as a rule on <u>subjects of this type</u>.

(<u>Id.</u> (emphasis added); <u>see also</u> Core 30(b)(6) Dep. at 49:19–23 ("[Bassignani's] reaction was that [Rios'] disability paperwork be filed with Meridian as he went out in April, prior to our coming onto the account in May.").)

Rios received Meridian disability benefits forms during his hospital stay.[17] (Pl. Dep. at 27:13–28:10.) Rios filled out the forms with the assistance of his wife, who could read English. (<u>Id.</u> at 27:10–18.) Rios never requested FMLA leave from Meridian. (<u>Id.</u> at 27:7–9.) Meridian approved three months of disability pay: $1,446 in total. (<u>Id.</u> at 21:2–12, 128:5–6.) Core acknowledged that it knew about the disability benefits paperwork to Meridian, and that at least Annis and Bassignani were notified. (Core 30(b)(6) Dep. at 49:9–18.)

By June 2015, other Core employees knew about Rios' disability benefits request to Meridian. In an email dated June 11, 2015, Donna Ferrera ("Ferrera"), a Core employee, asked Ciofalo whether Rios had taken disability leave. (C&B Defs. 56.1, Ex. V at D-496, D.E. # 54-22 at 3.) Ferrera further asked: "Do we expect him to <u>stay</u> with Core?" (<u>Id.</u> (emphasis added).) Ciofalo replied, carbon-copying Bassignani and DiLeone:

> Rios is out on disability, he had heart surgery, and from what we have been informed his doctors will not even consider releasing him back to work until some time in August. As far as I know he wants to return but <u>I don't believe he would be able to pass a fitness test if he does</u>.

---

[17] In addition, at some unknown date, Annis and Grogan, both at Meridian, approved use of vacation and sick leave to go to the hospital. (<u>Id.</u> at 70:2–9.) The cited materials do not make clear the distribution of vacation, sick leave, and disability leave days used to cover Rios' hospital stay.

(Id. at D-495 (emphasis added). But see Core 30(b)(6) Dep. at 42:22–43:4 (testifying that no one at Core knew of Rios' disability).)

On or about June 11, 2015, Core started seeking a temporary worker to fill Rios' position while he was out on disability leave. (C&B Defs. 56.1, Ex. X at D-57, D.E. # 54-24 at 2; id., Ex. AA, at D-461, D.E. # 54-27 at 2; id., Ex. BB at D-501, D.E. # 54-28 at 2.) In a June 11, 2015, email to Hutchinson, Ciofalo stated that Rios was a "mechanic[] out on disability," that Core will begin interviewing candidates to fill the "open position[]," that Rios "will be evaluated in August by his doctors for return to duty," and that Ciofalo does not believe Rios "would pass a fitness test on his return." (C&B Defs. 56.1, Ex. AA at D-461.) In a June 12, 2015, email to Ciofalo, Bassignani approved the search for a temporary worker, referring to Rios as an "employee[]" and noting that "we cannot conclusively determine if [he] will return until notified by the employee." (C&B Defs. 56.1, Ex. X at D-57.) Core's plan to hire a temporary mechanic was eventually thwarted; the Port Authority "told us that we were unable to hire additional personnel because of budgetary issues." (Core 30(b)(6) Dep. at 62:3–10.) According to Core, the conversation with the Port Authority occurred in July or August 2015. (Id. at 62:22–63:12.)

## VI.    Bassignani's Conduct

Also in or around July 2015, Bassignani requested that Rios provide a doctor's note stating that he was fully fit to work, and that he complete a physical fitness test. (Core 30(b)(6) Dep. at 58:14–59:4; see also Pl. Dep. at 96:21–97:5 (noting that Ciofalo told Rios about the request).) In July 2015, Rios gave Ciofalo a letter from his physician stating that he would be able to work starting on August 3, 2015.[18] (Pl. Dep. at 95:10–25; see also Core 30(b)(6) Dep. at 47:4–10, 59:11–

---

[18] Rios testified that he ultimately was scheduled to start work on August 5, 2015, despite being approved for work starting two days earlier. (Pl. Dep. at 18:7–16.)

15.) On July 6, 2015, at the latest, Bassignani and Ciofalo received Rios' "disability paperwork," because Annis provided it to them.[19] (C&B Defs. 56.1, Ex. CC at D-317 to -318, D.E. # 54-29 at 2–3.) Bassignani did not respond well to the paperwork. In a July 6, 2015, email responding to Annis, Bassignani wrote the following:

> This documentation is unacceptable. [Rios] is not an employee of Core. He has never been hired by [C]ore. No one is permitted to speak to him or provide him with any information from our office. He is also not permitted on site. Should he call our JFK SITE office he is to be directed to me only. That is all.

(Id., Ex. FF ("Bassignani Email I") at D-29, D.E. # 54-32 at 2.)

Sometime in July 2015, Bassignani and DiLeone had a conversation about Rios. (Id., Ex. GG ("Bassignani Memo") at D-506, D.E. # 54-33 at 6.) In a July 15, 2015, email, Bassignani referred to Rios as "the employee we never hired." (C&B Defs. Reply 56.1, Ex. NN at D-364, D.E. # 53-2 at 2.) On July 31, 2015, Bassignani issued a high-priority office memorandum to Ciofalo, Annis, Galvin, Montgomery, and other Core employees, as well as Hutchinson and Bournias. (Bassignani Memo at D-471 to -474.) In the memorandum, Bassignani stated that Core "did not retain the employment of" Rios, that he "was never hired by" Core," that he "does not work for" Core, and that he has never "worked for [Core at] any time in the past." (Id. at D-474.) Bassignani added that Core has "explained to Mr. Rios on several occasions that we do not have any positions available for him and that he is not permitted on site without authorization." (Id.

---

[19] On an unknown date, a Core employee whose initial named "MM" received a copy of a May 18, 2015, fax by Rios that included his "Notice and Proof of Claim for Disability Benefits." (C&B Defs. 56.1, Ex. Y at D-38 to -39, D.E. # 54-25 at 2–3; see also Mesidor Decl., Ex. 26, D.E. # 50-31.) It is unclear whether "MM" received the copy on May 18, 2015, or later. As noted above, the record reasonably implies that "MM" is Montgomery, a Core supervisor. The fax put Montgomery on notice that Rios requested disability benefits from Meridian on May 14, 2015; that he was hospitalized and had surgery; that he was diagnosed with "Obstructive CAD"; that April 30, 2015, was the first day Rios' "[d]isability" made him unable to work; and that August 3, 2015, was the date on which Rios "will be able to perform usual work." (See id.) In response to the fax, Montgomery wrote the following note: "[Rios] says he will be back on Aug. 3, 2015." (Id. at D-38.) Montgomery likely received the fax after June 12, 2015, on which Ciofalo wrote in an email that Rios' "Date of claim is unknown at this time . . . ." (Pl. 56.1, Ex. 30 at D-463.)

(emphasis in original).) "[W]e consider Mr. Rios a trespasser," Bassignani added. (Id. (emphasis in original).) He also instructed that "[n]o [Core] employees or staff is permitted to speak to Mr. Rios at any time for any reason without authorization while working for" Core, that "[a]ny attempts to assist or speak to Mr. Rios for any reason will be cause for disciplinary action," and that "[y]ou must notify me directly of any occurrence involving" Rios. (Id.)

Although Bassignani's July 31, 2015, memorandum stated that Core employees told Rios multiple times about the lack of positions at the company, the earliest such conversation identified in the parties' cited materials occurred on August 5, 2015, the date on which Rios planned to start work.[20] (Core 30(b)(6) Dep. at 66:14–24; Pl. Dep. at 18:7–16 (stating that he arrived August 5, 2015, not August 3, 2015).) In his opposition brief, Rios provides a copy of Core's August 5, 2015, employee sign-in sheet, which includes his name. (Mesidor Decl., Ex. 39 at Rios Confidential 6, D.E. # 50-44 at 2.)

Rios also provides a December 30, 2015, email in which Bassignani told Ciofalo the following:

> In preparation for and regarding Rios can you please try to casually ask around about his past performance. I'm not trying to create anything that isn't there but I know I recall conversations I had with Andy Grabowski or James Galvin and even possibly [H]utchinson that Rios['] performance was substandard. This was one of the main reasons we had elected to not hire him as this option was within our discretion to do so.
>
> I can't find any emails attesting to this but I do recall having the conversations[.] I just don't recall with who.

(Mesidor Decl., Ex. 32 ("Bassignani Email II") at D-515 to -516 (emphasis added), D.E. # 50-37 at 2–3.) Ciofalo added that he recalled similar conversations with Galvin and Hutchinson. (Id. at

---

[20] Annis was notified at an unknown date that Core did not have a position available for Rios. (Core 30(b)(6) Dep. at 61:17–24.)

D-515.) In an email about an hour later, Bassignani clarified that he wanted the employees' statements for the "file history," and noted that a meeting with the Equal Employment Opportunity Commission ("EEOC") might take place the following month. (Id. at D-514.) In response, Ciofalo provided Bassignani with two-sentence statements from both Galvin and Andy Grabowski. (Id. at D-514, -517 to -518.) The cited materials do not reveal whether Hutchinson had a negative opinion of Rios' work.

## VII.    The Current Litigation

Rios filed his initial Complaint on April 12, 2016, and his Amended Complaint on June 16, 2016, against Core, Meridian, and Bassignani. (D.E. # 1. 20.) After Meridian had served him with its dismissal motion, Rios voluntarily dismissed his claims against it on August 1, 2016. (See D.E. # 27–29.) Discovery proceeded from August 9, 2016, to April 5, 2017, (D.E. # 31, 40). On August 10, 2017, Core and Bassignani filed their joint summary judgment motion. (D.E. # 51.) The Court heard oral argument on October 10, 2017. (D.E. dated Oct. 10, 2017.)

## STANDARD OF REVIEW

In their summary judgment motion, Defendants must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made the requisite showing that there is no factual dispute, the nonmoving party bears the burden of presenting evidence to show that there is, indeed, a genuine issue for trial," Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001)—that is, the nonmoving party must undermine the moving party's presentation or "offer some hard evidence showing that its version of the events is not wholly fanciful," Fed. R. Civ. P. 56(c)(1)(B); Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005). In the end, to award summary judgment, the Court must be convinced that "there can be but one reasonable conclusion as to the verdict,

i.e., it is clear what the truth is." Rogoz v. City of Hartford, 796 F.3d 236, 246 (2d Cir. 2015) (alteration in original) (internal citation and quotation marks omitted).

## DISCUSSION

Core and Bassignani argue that the FMLA, ADA, and NYCHRL claims against them should fail as a matter of law. Although the Court agrees with them on some ADA claims, the Court finds genuine issues of material fact with respect to the other ADA claims, as well as the FMLA and NYCHRL claims. The Court addresses each claim in turn.

## I. FMLA

The FMLA confers a private right of action upon "employees who need to take time away from work to deal with serious health conditions of the employee or her family" and are not given the time by their employers. Woods v. START Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 165–66 (2d Cir. 2017). An employee covered by the FMLA "shall be entitled to 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2912(a)(1). The employee also "has the right to return to the position she held before taking leave, or to an 'equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" Woods, 864 F.3d at 156 (quoting 29 U.S.C. § 2614(a)(1)(B)). The Woods court explained the types of FMLA claims that an employee may assert:

> FMLA claims come in at least two varieties: interference and retaliation. In a general sense, an employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. 'Retaliation' claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer.

Id.

In this case, Rios asserts both interference and retaliation claims, and they derive from 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. See also id. (retaliation claims); Shultz v. Congregation Shearith Isr. of City of N.Y., 867 F.3d 298, 307 (2d Cir. 2017) (interference claims).

In their joint summary judgment motion, Core and Bassignani make five arguments, two involving both claims, two involving the interference claims, and the last involving the retaliation claims. For the reasons set forth below, the Court rejects all five arguments and denies summary judgment on the FMLA claims.

## A.    Rios' Eligibility as an "Employee" Under the FMLA

Core and Bassignani contend that Rios is not an "employee" under 29 U.S.C. § 2611(2) as a matter of law. For the reasons stated below, the Court finds that they fail to show the absence of a genuine issue of material fact.

In relevant part, the FMLA defines an "eligible employee" as:

> an employee who has been employed—
>
> > (i) for at least 12 months by the employer with respect to whom leave is requested . . . ; and
> >
> > (ii) for at least 1,250 hours of service with such employer during the previous 12-month period.

29 U.S.C. § 2611(2)(A). The two key words in the definition are "employed" and "employer." The FMLA generally defines "employ" as "to suffer or permit to work." Id. §§ 203(g), 2611(3). The FMLA also specifically defines "employer" as "any person"—or any "successor in interest of" the person—who is "engaged in commerce or in any industry or activity affecting commerce"

and "who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. §§ 2611(4)(A)(i)–(ii).

Successor-of-interest liability is relevant here. In determining whether an employer is a "successor in interest," the Court considers numerous factors, such as:

>　(1) Substantial continuity of the same business operations;

>　(2) Use of the same plant;

>　(3) Continuity of the work force;

>　(4) Similarity of jobs and working conditions;

>　(5) Similarity of supervisory personnel;

>　(6) Similarity in machinery, equipment, and production methods;

>　(7) Similarity of products or services; and

>　(8) The ability of the predecessor to provide relief.

29 C.F.R. § 825.107(a). The Court contemplates the "entire circumstances . . . viewed in their totality." Id. § 825.107(b). And when "an employer is a successor in interest, employees' entitlements are the same as if the employment by the predecessor and successor were continuous employment by a single employer." Id. § 825.107(c). "For example, the successor, whether or not it meets FMLA coverage criteria, must grant leave for eligible employees who had provided appropriate notice to the predecessor, or continue leave begun while employed by the predecessor . . . ." Id. The successor "must count periods of employment and hours of service with the predecessor . . . ." Id.

The parties agree that Rios—who has been at JFK for at least 11 years, (Pl. Dep. at 13:12–14:16, 15:15–20, 28:11–29:2)—was "employed" for the requisite number of months and hours by Meridian. Rios argues that Core is a successor-in-interest to Meridian, and Core and Bassignani

do not seriously disagree. Indeed, the record as recounted above contains significant evidence that Core was continuing Meridian's services at the JFK facilities, that Core's standard practice is to hire most if not all of the prior employees in the buildings, and that the supervisory personnel were similar. Moreover, Rios testified that he sought FMLA leave from Bassignani (and potentially a second, unnamed Core employee) after Core had taken over and Meridian had left. (See Pl. Dep. at 26:12–27:2, 79:24–80:6.)

The parties instead dispute whether Rios is an "employee" of Core. Core and Bassignani contend that "[t]he evidentiary record is devoid of any hallmark of a qualifying employment relationship." (C&B Defs. Br. at 9–10, D.E. # 51.) They claim that Core never "suffer[ed] or permit[ted]" Rios "to work," because the record shows that he went to the hospital on April 30, 2015—the last day of Meridian's tenure at the JFK facilities—and that he never had another work day at JFK. However, Core and Bassignani fail to show the absence of a genuine issue of material fact. The cited materials reasonably show, among other things, that Rios was measured for a Core uniform, that he received a Core ID card, and that he received health benefits from Core for a period of three months. Core and Bassignani argue that the uniform measuring and ID card preparation were performed for the Meridian employees, regardless of whether Core retained them. Core and Bassignani also argue that Rios was added to the benefits policy in error. Still, a reasonable jury may find from these objective indicators that Rios was an "employee" under the FMLA. In addition, the jury may rely not only on the numerous statements made by Core employees from March to June 2015 that Rios was an employee, (see, e.g., Application at D-408; C&B Defs. 56.1, Ex. L at D-677; id., Ex. V at D-496; id., Ex. W at D-503; id., Ex. X at D-57), but also on the copy of Core's August 5, 2015, employee sign-in sheet, which included Rios' name. A reasonable juror may also conclude that Core expected him to show up for work on May 1,

2015. (See Core 30(b)(6) Dep. at 50:2–4; Pl. Aff. ¶ 5.) The Court cannot say as a matter of law that Rios fails to show that he is an FMLA "employee."

### B. "Employer Liability" for Bassignani

Bassignani contends that he is not liable as an "employer" under 29 U.S.C. § 2611(4). (C&B Defs. Br. at 17–18.) For the following reasons, the Court finds a genuine issue of material fact precluding summary judgment.

An individual may be liable as an FMLA employer if he "acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). The Court applies the "economic reality test" to analyze individual liability. Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 422 (2d Cir. 2016). The Court considers a totality of factors, such as "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999)). "No one of the four factors standing alone is dispositive[,] . . . [and] any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." Id. (alterations in original) (quoting Herman, 172 F.3d at 139). The ultimate question is whether, "under the totality of the circumstances," the individual exercised "sufficient control over [Rios'] employment"—that is, the individual "controlled in whole or in part [Rios'] rights under the FMLA." Id. at 422, 424 (quoting Noia v. Orthopedia Assocs. of Long Island, 93 F. Supp. 3d 13, 16 (E.D.N.Y. 2016)).

Here, Bassignani has failed to show the absence of a genuine issue of material fact. Bassignani's testimony arguably shows that three of the four Graziadio factors cut against Rios. The testimony indicates that Bassignani does not supervise or control worker schedules or

conditions, does not set pay for the workers, and does not maintain employment records. (Bassignani Aff. ¶¶ 6–8.) The parties principally dispute the fourth factor: Bassignani's hiring and firing authority. Bassignani argues that, although he had hiring responsibilities "at the inception of" the JFK Contract, the "Port Authority had to approve the hiring or termination of any employees." Except for the affidavit testimony attached to his summary judgment brief, (see Bassignani Aff. ¶ 5), he provides little support for the argument.[21] The Court questions whether Core and Bassignani's cited materials have laid the proper foundation for Bassignani to opine on the Port Authority's hiring power. And as the Court will soon explain, see infra Section I(E), it is not clear that Bassignani is correct. Even if a jury were to credit the testimony, however, the record as described above would provide sufficient evidence for the jury to rebut Bassignani's argument. Among other things, Bassignani requested from Rios a doctor's note relating to his heart condition, and he wanted Rios to complete a physical fitness test before starting work at Core. (Core 30(b)(6) Dep. at 58:14–59:4.) Bassignani was among the employees at Core who received a copy of Rios' "disability paperwork," and the parties' cited materials indicate that he was the first Core employee to state affirmatively that Rios "has never been hired by" the company. (See C&B Defs. 56.1, Ex. CC at D-317 to -318; Bassignani Email I at D-29.) Bassignani also was the one to announce to Core employees, through an office memorandum, that Core "did not retain the employment of" Rios and that he "was never hired by" Core. (Bassignani Memo at D-474.) Finally, Rios testified that, even though he reached out to Core employees during his hospitalization, he specifically contacted Bassignani for FMLA forms. (Pl. Dep. at 26:12–27:2.) The evidence and testimony reasonably suggest that Bassignani has significant authority over Rios' employment status at Core

---

[21] In his brief, Bassignani cites primarily to ¶¶ 3 and 15 of his and Core's Rule 56.1 statement. (See C&B Defs. Br. at 18.) Paragraph 3 does not discuss hiring, and ¶ 15 is a non sequitur asserting, in its entirety: "The Contract required that Core furnish competent and adequately trained personnel to perform work under the Contract other than the thirteen employees listed on the seniority list."

and his FMLA rights. Accordingly, a reasonable juror could conclude that Bassignani should be individually liable.

## C.     Timely Notice

The Court now turns to the individual FMLA claims, first with the interference claims. Core and Bassignani contend that they received no timely notice and that Rios therefore may not assert an interference claim under the FMLA. The Court denies their motion because it finds a genuine issue of material fact.

To prove an interference claim, Rios must show that (1) he "is an eligible employee under the FMLA"; that (2) "the defendant is an employer as defined by the FMLA"; that (3) he "was entitled to take leave under the FMLA"; that (4) he "gave notice to the defendant of [his] intention to take leave"; and that (5) he "was denied benefits to which [he] was entitled under the FMLA." Shultz, 867 F.3d at 307.

The parties agree that the leave at issue here was unforeseeable. Therefore, Rios was obligated to provide notice to his employer only "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a); Coutard v. Mun. Credit Union, 848 F.3d 102, 109 (2d Cir. 2017) (noting that the district court, in analyzing notice, must "interpret[] the DOL regulations"). "Notice may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally." 29 C.F.R. § 825.303(a).

Here, Core and Bassignani assert that Rios told Annis about the hospitalization on May 11, 2015; that Core knew about Rios' surgery on or about June 11, 2015; and that Rios provided disability paperwork to Annis on July 6, 2015. (C&B Defs. Br. at 12–13.) Core and Bassignani also argue that Rios could have notified Core earlier because he had "notified former Meridian

22

employees of his hospitalization immediately upon learning of his need for surgery." (Id. at 13.) However, Core and Bassignani mischaracterize the evidence. Construed in Rios' favor, the cited materials reveal the following: On or around May 1, 2015, after Core had started operations, Rios spoke about his heart surgery with Core employees Annis, Galvin, and Montgomery, as well as other former Meridian employees whom Core may have retained. (Pl. Dep. at 49:6–20, 50:2–14, 63:5–25.) Rios testified that he told Annis about his OCAD diagnosis. (Id. at 149:24–150:9.) On or before May 11, 2015, Annis had a phone conversation with Bassignani about Rios' "disability." (C&B Defs. 56.1, Ex. W at D-503.) Core and Bassignani also fail to address Rios' testimony that sometime during his hospitalization, he requested, to no avail, FMLA leave forms from Bassignani. (See Pl. Dep. at 26:12–27:2; see also id. at 79:24–80:6.) A reasonable jury can find from the admissible evidence in the cited materials that Rios provided notice as early as the first day Core took over operations.[22]

The cases Core and Bassignani cite in support of their arguments do not persuade the Court to find summary judgment in their favor. (C&B Defs. Br. at 12–14.) Pesok v. Hebrew Union College-Jewish Institute of Religion, 235 F. Supp. 2d 281 (S.D.N.Y. 2002), and Slaughter v. America Building Maintenance Co. of New York, 64 F Supp. 2d 319 (S.D.N.Y. 1999), involve a prior version of the FMLA regulations, which provided that an employee generally is "expected" to "give notice to the employer within no more than one or two working days of learning of the

---

[22] In their reply brief, Core and Bassignani argue that "Plaintiff had the ability to contact family and friends regarding his heart surgery since April 30, 2015." (C&B Defs. Reply at 5.) "Arguments made for the first time in a reply brief need not be considered by a court." Playboy Enters., Inc. v. Dumas, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997), aff'd, 159 F.3d 1347 (2d Cir. 1998). In any event, the cited materials do not show the absence of a factual dispute that it was practicable for Rios to contact others on April 30, 2015. Core and Bassignani's citation in their brief does not support their assertion. (See C&B Defs. Reply at 5 (citing C&B Defs. 56.1 ¶ 47).)

Moreover, a jury reasonably may find that Rios' wife, who could have served as his representative in normal circumstances, could not reach out to Core employees, because she was suffering from a respiratory issue and became hospitalized, too. (See Pl. Decl. ¶¶ 7–8.)

need for leave," 29 C.F.R. § 825.303(a) (1995). The Department of Labor promulgated new FMLA regulations "eliminat[ing] the expectation . . . ." Mason v. Steelcraft, Inc., No. 07-CV-584 (HJW), 2009 WL 650387, at *7 (S.D. Ohio Mar. 10, 2009); see also 29 C.F.R. § 825.303(a) (2013). Both Mehmeti v. Jofaz Transportation, Inc., 649 F. App'x 112 (2d Cir. 2016), and Brown v. Pension Boards, 488 F. Supp. 2d 395 (S.D.N.Y. 2007), involved a plaintiff who contacted a third party before reaching the employer. Here, a reasonable juror can determine that Rios contacted Core employees before anyone else. In Bishop v. New Process Gear, Inc., No. 5:06-CV-821 (GTS), 2009 WL 3928679 (N.D.N.Y. Nov. 18, 2009), the plaintiff admitted that he could have contacted his employer earlier. No such testimony is cited here. Finally, timeliness was not at issue in De La Rama v. Illinois Department of Human Services, 541 F.3d 681 (7th Cir. 2008), and Rivera v. Crowell & Moring, L.L.P., No. 14-CV-2774 (KBF), 2016 WL 796843 (S.D.N.Y. Feb. 18, 2016). Therefore, the Court denies summary judgment on the issue of timely FMLA notice.

### D. Adequate Notice

Core and Bassignani also contend that Rios may not make an FMLA interference claim because he failed to provide adequate notice to them. Here, too, there exist genuine issues of material fact that preclude summary judgment in Defendants' favor.

In addition to being timely, Rios' notice must contain "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). At a minimum, the employee must "state a qualifying reason for the needed leave," id. § 825.301(b)—in this case, "a serious health condition that makes the employee unable to perform the functions of the employee's job," id. § 825.112(a)(4). Otherwise, "[d]epending on the situation, [sufficient] information may include that a condition renders the employee unable to perform the functions of the job; that the employee is pregnant or has been hospitalized

24

overnight; . . . and the anticipated duration of the absence, if known." Id. § 825.301(b). Rios here "need not expressly assert rights under the FMLA or even mention the FMLA." Id. And the employer "will be expected to obtain any additional required information through informal means." Id. Still, "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations" under the FMLA. Id.

Core and Bassignani contend that (1) any notice to Annis is inadequate because she was not an "employer" under the FMLA; and that (2) Rios failed to apprise Annis of enough information for her to infer a need for FMLA leave. (C&B Defs. Br. at 14–16.) The Court first notes that the validity of the arguments turns on whether Annis was the only one to receive notice. As stated above, a reasonable juror may find, among other things, that Rios requested but was denied FMLA leave forms from Bassignani. However, even if a jury focused entirely on Annis' conversation with Rios, the jury nonetheless reasonably could conclude that he provided adequate notice. The Court easily disposes of Core and Bassignani's first legal argument, which has no basis in the case law. They cite to only two cases—Chanicka v. JetBlue Airways Corp., 243 F. Supp. 3d 356 (E.D.N.Y. 2017), and Tracy v. NVR, Inc., 667 F. Supp. 2d 244 (W.D.N.Y. 2009)— and neither discusses FMLA notice.[23] In addition, the consequence of such a defense is highly problematic: A human-resources supervisor or a company CEO could avoid liability simply by having her administrative assistant answer every call from an employee subject to the FMLA's protections. Such a result is inconsistent with the statute and Department of Labor regulations.

With respect to the second argument, the Court finds a genuine issue of material fact. According to Core and Bassignani, Rios told Annis only that he "had fallen ill and was hospitalized." (C&B Defs. Br. at 15.) Annis also testified that "[a]t no point did [he] tell [her that]

---

[23] In fact, Chanicka concerns a tortious interference with business relations claim. See 243 F. Supp. 3d at 360–63.

he was disabled[,] nor did [she] believe him to be disabled." (Annis Aff. ¶ 4.) However, the cited materials also reasonably show that Rios told her about his OCAD diagnosis. (Pl. Dep. at 149:24–150:9.) Moreover, he testified that he told Annis "to take [his] vacation and [his] sick days so as to—so that [he] could go to the hospital" for an "emergency." (Id. at 54:23–55:8.) As stated above, an employee need not "expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.301(b). Relevant to the conversation with Annis, the employee must, at a minimum, "specifically reference" "a serious health condition that makes the employee unable to perform the functions of the employee's job." Id. §§ 825.112(a)(4), 825.301(b). Sufficient information "may include . . . that the employee . . . has been hospitalized overnight . . . ." Id. Here, a reasonable jury may conclude that Rios put Annis on notice that he had a heart condition serious enough to necessitate overnight hospitalization and a surgery, and that Rios needed to take leave in light of the hospitalization. Moreover, a reasonable jury may rely on Annis' own words shortly after the conversation; on May 11, 2015, she mentioned to Bassignani and Ciofalo in an email that Rios had a "disability." (C&B Defs. 56.1, Ex. W at D-503.) Accordingly, the cited records and testimony provide sufficient evidence for a reasonable jury to find that Core and Bassignani were put on notice that Rios needed FMLA leave.

### E. Legitimate, Nondiscriminatory Reason

Finally, Core and Bassignani argue that Rios' FMLA retaliation claim fails as a matter of law because he fails to rebut their legitimate, nondiscriminatory reason for the adverse employment action against him. For the reasons set forth below, the Court denies summary judgment on the claim.

Because no party disputes the framework's applicability, the Court applies "the burden-shifting test set forth in McDonnell Douglas Corp. v. Green," 411 U.S. 792 (1973), for purposes

of the summary judgment motion. See Graziadio, 817 F.3d at 429 & n.7; Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 152 (2d Cir. 2012). Under McDonnell Douglas, Rios must first make a prima facie case by establishing that (1) "he exercised rights protected under the FMLA"; that (2) "he was qualified for his position"; that (3) "he suffered an adverse employment action"; and that (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Id. If Rios makes such a prima facie case, Core and Bassignani "must demonstrate a legitimate, non-discriminatory reason for [their] action . . . ." Id. If they make such a demonstration, then Rios must "show that [their] proffered explanation is pretextual." Id.

Core and Bassignani do not challenge Rios' prima facie case under the FMLA. Rather, they argue that he has failed, as a matter of law, to rebut their legitimate, nondiscriminatory reason: "[T]he Port Authority prohibited Core from filling open spots by hiring additional employees." (C&B Defs. Br. at 16; see also id. at 22 ("Because Core did not have the authority to hire Plaintiff, it did not do so.").) The Court concludes that a reasonable jury could disagree.

For retaliation claims "rooted in § 2615(a)(1)," Rios has a light burden to show genuine factual issues with respect to pretext. See Woods, 864 F.3d at 168–89; see also Hockenjos v. MTA Metro-North Railroad, 695 F. App'x 15, 16 (2d Cir. 2017) (noting that the Woods standard applies to analyzing pretext). Under Woods, litigants asserting such retaliation claims must establish only that the discriminatory reason was a "motivating factor" in—not a but-for cause of—the adverse employment action. 864 F.3d at 166. In other words, Rios must show only that Defendants "use[d]" the exercise or attempted exercise of FMLA rights "as a negative factor" in an employment action. See 29 C.F.R. § 825.220(c); see also Hockenjos, 2017 WL 3447120, at *1; Woods, 864 F.3d at 168–69 (noting that § 2615(a)(1) prohibits "using the exercise of FMLA rights

at all in making employment decisions"). In addition, at summary judgment, Rios may show pretext by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Graziadio, 817 F.3d at 430. A reasonable jury "could conclude" pretext from "such discrepancies." Id.

Here, the cited materials provide sufficient evidence for at least three findings that preclude summary judgment for Core and Bassignani.

First, a reasonable jury may find that Core and Bassignani fail to establish their purported nondiscriminatory reason. The record is murky at best on whether the Port Authority had power to hire Core employees. Hutchinson stated that he was not involved with deciding whether employees would continue working at Core, that he never made the decision "not to hire" Rios, and that he does not recall having a conversation with any Core employee about "hiring" or "rehiring" Rios. (Hutchinson Dep. at 31:24–32:12, 53:17–21, 88:17–89:6.) Although the JFK Contract provides that the Port Authority may revise work schedules and shifts for employees, the agreement does not establish that the Port Authority may hire or fire any individual employee. At most, the agreement appoints the "Manager" as the person who "determine[s] the total number of staff to be employed" by Core. (JFK Contract at D-605.) Bassignani's uncontroverted testimony indicates that Bournias is the Manager, (see Bassignani Dep. at 107:20–108:2), neither party has provided testimony from him, and nothing in the cited materials suggests that he altered Core's employment numbers to preclude Rios' employment. In addition, Core and Bassignani provide testimony contradicting the purported nondiscriminatory reasoning and stating that they made the decision "not to hire" Rios in August 2015. (Bassignani Dep. at 164:6–23; Core 30(b)(6) Dep. at 43:5–9; see also Bassignani Email II at D-515 ("This was one of the main reasons we had elected to not hire him . . . .").)

Second, even if the jury were to find that Core and Bassignani sufficiently demonstrated their nondiscriminatory reason, the jury reasonably might reject the justification as pretextual. The Court notes two reasons. First, even if the Port Authority had the power to "hir[e] additional employees," (see C&B Defs. Br. at 16), a jury reasonably could find the basis implausible because Rios had been hired long before he had gone to the hospital and Core had taken over. See, e.g., Greenidge v. Costcos Wholesale, No. 09-CV-4224 (RRM), 2012 WL 10774455, at *3 (E.D.N.Y. Mar. 30, 2012) (noting that an employer may not prevail on a purported nondiscriminatory reason "if that reason did not motivate it at the time of the decision"). As stated above, the cited materials reasonably could show that Rios was measured for a Core uniform, that he received training, that he received a Core ID card, and that he was receiving Core health benefits, which Core had set up before May 1, 2015. (See Bassignani Dep. at 61:21–63:4; Core 30(b)(6) Dep. at 25:13–16, 26:9– 11, 35:19–36:4; Pl. Dep. at 44:5–12, 50:12–51:6, 66:6–11; Application at D-413; C&B Defs. 56.1, Ex. J at D-21 to -23; id., Ex. L at D-677; id., Ex. M at D-680; id., Ex. O at D-490; Mesidor Decl., Ex. 40 at D-680; Pl. Aff. ¶ 5.) Moreover, on March 27, 2015, a Core representative certified to the federal government under penalty of perjury that Rios' employment start date at Core was May 1, 2015. (Application at D-408.) The certification reasonably implies that Rios' hiring occurred more than a month before the hospital stay. Second, Bassignani's emails in December 2015 undermine the credibility of Core and Bassignani in asserting a nondiscriminatory reason. A few weeks before an EEOC meeting related to Rios, Bassignani asked Ciofalo to "try to casually ask around about [Rios'] past performance." (Bassignani Email II at D-514 to -515.) Beside their emails and the two two-sentence statements Ciofalo procured on Bassignani's behalf, the cited materials do not provide any indication that Rios performed poorly as a mechanic during his time at Meridian. The materials also do not show Bassignani or any Core employee complaining about

29

Rios' record before the December 2015 emails. Accordingly, a reasonable juror may conclude that Bassignani, in response to the EEOC hearing, was trying to add negative statements to Rios' "file history." (See id. at D-514.) The email gives the impression that Bassignani, and by proxy Core itself, was trying to manufacture reasons to fire Rios. Such conduct reasonably suggests pretext.

Third, even if the Port Authority's veto were one of Core and Bassignani's legitimate reasons for not retaining Rios, the jury reasonably might find that they additionally held retaliatory intent under the FMLA. See Woods, 864 F.3d at 166 (requiring only a "motivating factor," not a but-for cause). When he first learned that Rios' "disability" developed "[p]rior to starting here with Core," Bassignani appeared to wash his hands of Rios' predicament. (C&B Defs. 56.1, Ex. W at D-503.) "If he was out prior to, then it's on their watch," he wrote. (Id.) He added: "While we want to assist [Rios,] we also don't want to cross any lines or really be in communication with the former contractor as a rule on subjects of this type." (Id. (emphasis added).) A reasonable juror can interpret the email as an expression of unwillingness to provide Core benefits for retained JFK employees such as Rios when the benefits involve "subjects of this type"—an ambiguous phrase that, uncharitably read, could refer to employees with physical impairments and other disabilities. However, as successor-in-interest, Core sometimes must "continue leave begun while employed by the predecessor . . . ." 29 C.F.R. § 825.107(c). Furthermore, a reasonable juror could conclude discriminatory intent from Bassignani's reaction to Rios' filed "disability paperwork": deeming Rios "not an employee of Core" and writing a memorandum that, among other things, forbids Core employees from speaking with him and labels him a "trespasser." (See Bassignani Email I at D-29; Bassignani Memo at D-506 (emphasis in original).)

For the reasons described above, the Court denies summary judgment on the grounds of Core and Bassignani's proffered nondiscriminatory reason. Because none of Core and Bassignani's FMLA arguments persuades this Court, the FMLA interference and retaliation claims may proceed to trial.

## II.     ADA

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove an ADA claim, Rios must show that (1) "the employer is subject to the ADA"; that (2) Rios "is disabled within the meaning of the ADA or perceived to be so by [his] employer"; that (3) he "was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation"; that (4) he "suffered an adverse employment action"; and that (5) "the adverse action was imposed because of [his] disability." Davis v. N.Y.C. Dep't of Educ., 804 F.3d 231, 235 (2d Cir. 2015). For purposes of the joint summary judgment motion, Core and Bassignani do not dispute the first, third, and fourth elements.

Like the FMLA retaliation claim above, the ADA claim is subject to the McDonnell Douglas framework:

> [O]nce a plaintiff produces minimal evidentiary support for the claim of discriminatory motivation, the burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action. But once the employer has set forth its non-discriminatory justification, the plaintiff must then produce evidence capable of carrying the burden of persuasion that the employer's action was at least in part motivated by discrimination.

Id. (citations omitted). Under the relevant part of the ADA, "disability" means (1) "a physical or mental impairment that substantially limits one or more major life activities," or (2) a state of

"being regarded as having such an impairment." 42 U.S.C. § 12102(1). "The definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of" the ADA. Id. § 12102(4). Rios attempts to prove an actual or perceived disability claim in this case.

Core and Bassignani argue that (1) Rios fails to establish an actual disability under the ADA; that (2) he fails to make a prima facie showing of two elements of his perceived disability claim; and that (3) they had a legitimate, nondiscriminatory reason for not retaining him. For the following reasons, the Court finds summary judgment in favor of them for the actual disability claims but not for the perceived disability claims.

### A.    Actual Disability Claims

With respect to Rios' prima facie showing of an actual disability claim, Core and Bassignani challenge only the second element: the existence of an actual disability under the ADA. The Court agrees that proof of this element is lacking, and thus finds that Rios has failed to make the required showing as a matter of law.

The Court first notes that both parties cite to cases applying outdated law on actual disability claims,[24] (see C&B Defs. Br. at 18–20; Pl. Br. at 16–18; C&B Defs. Reply at 9–10), and the Court therefore details the law it applies in this case. With respect to Rios' actual disability claim, the Court "consider[s]: (1) 'whether the plaintiff suffered from a physical or mental impairment,' (2) whether "'the life activity' upon which the plaintiff relied . . . constitutes a major life activity under the ADA,' and (3) whether 'the plaintiff's impairment "substantially limited" [the] major life activity identified.'" Jacques v. DiMarzio, Inc., 386 F.3d 192, 201 (2d Cir. 2004) (alterations in original) (quoting Colwell v. Suffolk Cty. Police Dep't, 158 F.3d 635, 641 (2d Cir.

---

[24] One case, De La Rosa v. Potter, 427 F. App'x 28 (2d Cir. 2011), did not address actual disability claims at all. (See C&B Defs. Br. at 20.)

1998)), <u>superseded in part by statute on other grounds</u>, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified in scattered sections of 29 and 42 U.S.C.). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

With respect to the substantial limitation prong, the federal courts for many years imposed a "demanding standard" that required a "considerable" or "large" impairment, one that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." See, e.g., Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 196–98 (2002), superseded by statute, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified in scattered sections of 29 and 42 U.S.C.). However, Congress enacted the ADA Amendments Act of 2008 ("ADAAA") "in part because it had concluded that Toyota Motor 'interpreted the term "substantially limits" to require a greater degree of limitation than was [originally] intended by Congress,' and 'created an inappropriately high level of limitation necessary to obtain coverage under the ADA.'" Price v. City of N.Y., 558 F. App'x 119, 120 (2d Cir. 2014) (quoting ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ 2(a)(7), 2(b)(5), 122 Stat. 3553, 3553–54).

Rios now has a relatively light burden. See 29 C.F.R. § 1630.2(j)(1)(iii) (noting that the substantial limitation prong "should not demand extensive analysis").[25] Post-ADAAA regulations require him to show only that the impairment "substantially limits"—but not necessarily "prevent[s], or significantly or severely restrict[s]"—his "ability . . . to perform" at least one "major

---

[25] The Court "accord[s] 'great deference' to the EEOC's interpretation of the ADA, since it is charged with administering the statute." Francis v. City of Meriden, 129 F.3d 281, 283 n.1 (2d Cir. 1997) (quoting Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 309 (2d Cir. 1996)).

life activity as compared to most people in the general population." Id. §§ 1630.2(j)(1)(ii), 1630.2(j)(1)(viii). Moreover, the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting." Id. § 1630.2(j)(1)(ix).

Relatively few cases in this Circuit have applied the ADAAA and its regulations to claims based upon conduct occurring after the statute became effective in 2009. See also Ragusa v Malverne Union Free Sch. Dist., 381 F. App'x 85, 87 n.2 (2d Cir. 2010) (noting that federal courts must apply "the version of [ADA] in effect during the time period at issue"). Still, even under the new ADA regime, the Court finds that Rios fails as a matter of law to establish an actual disability under the ADA. The cited materials in this case offer no evidence suggesting that Rios, during his hospitalization, was substantially limited in his ability to perform any major life activities. The cited materials do not even indicate that, by virtue of being out in a hospital or having a heart condition, Rios was substantially limited in his ability to perform electric and plumbing work, or other jobs. Cf. Krachenfels v. N. Shore Long Island Jewish Health Sys., No. 13-CV-243 (JFB), 2014 WL 3867560, at *14 (E.D.N.Y. July 29, 2014) (noting that, when the major life activity is work, the employee must be substantially limited from performing "a class of jobs or a broad range of jobs"). Accordingly, Rios fails to meet his burden of making a prima facie showing of a substantially limiting impairment.

### B. Perceived Disability Claims

However, the Court denies summary judgment in favor of Core and Bassignani on the perceived disability claims. Their briefing on the issue is not entirely clear, (see C&B Defs. Br. at 20–21), but they appear to make two arguments: that (1) Rios fails to make a prima facie showing of discriminatory intent, and that (2) he fails to make a prima facie showing that Core perceived a disability.

The Court easily disposes of the first argument. "[P]laintiff must show that the adverse employment action 'took place under circumstances giving rise to an inference of discrimination.'" Davis, 804 F.3d at 235 (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). For the reasons stated above, see supra Section I(E), a reasonable juror may infer discrimination from attempts by Bassignani in May 2015 to disclaim Core's responsibility for helping Rios during his hospitalization, and from Bassignani's reaction in July 2015 to receiving Rios' "disability paperwork," (see C&B Defs. 56.1, Ex. W at D-503; Bassignani Email I at D-29; Bassignani Memo at D-506). Regardless of whether the adverse employment action was Core's failure to provide Rios with full benefits (including FMLA leave) in May 2015 or Core's decision "not to hire" Rios in July 2015,[26] the record provides more than sufficient evidence for a rational jury to infer discrimination.

The second argument is also unavailing. "Whether an individual is 'regarded as' having a disability is a question of the employer's intent, rather than whether the employee actually has a disability." Hammond v. Keyspan Energy, 349 F. App'x 629, 631 (2d Cir. 2009), superseded by statute in part on other grounds, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified in scattered sections of 29 and 42 U.S.C.); see also Darcy v. City of N.Y., No. 06-CV-2246 (RJD), 2011 WL 841375, at *4 (E.D.N.Y. Mar. 8, 2011) ("The statute does not require that an individual seeking its protections requires him to show that the employer had a reasonable basis for perceiving him as suffering from a disability; it merely requires him to show that the employer did so perceive him."). Before the ADAAA, the federal courts permitted perceived

---

[26] The parties have not litigated what constitutes, under the ADA, the adverse employment action in this case. Because Core and Bassignani have not challenged the existence of such an action, the Court will not comment further on what Rios needs to establish at trial. The Court notes, however, that Core and Bassignani appear to argue in their perceived disability section that the adverse action was the "fail[ure] to hire" Rios in August 2015. (See C&B Defs. Br. at 21.) As the record evidence shows, a reasonable juror could find that the adverse action occurred in May or July.

disability claims only if the employee showed that the employer (1) "mistakenly believe[d] that a person ha[d] a physical impairment that substantially limit[ed] one or more major life activities," or (2) "mistakenly believe[d] that an actual, nonlimiting impairment substantially limit[ed] one or more major life activities." See, e.g., Sutton v. United Air Lines, Inc., 527 U.S. 471, 479 (1999). However, the ADAAA "reject[ed]" the Sutton standard because it "narrow[ed] the broad scope of protection intended to be afforded by the ADA." ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ 2(a)(4), 2(b)(3), 122 Stat. 3553, 3553–54. In light of the ADAAA, Rios must show that Core and Bassignani performed the adverse employment action "because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit to a major life activity." 42 U.S.C. § 12102(3)(A) (emphasis added). Therefore, to deny summary judgment, the Court must find a genuine issue of material fact on whether Core and Bassignani "regarded him as having a mental or physical impairment." Hilton v. Wright, 673 F.3d 120, 129 (2d Cir. 2012). And Rios need not "present evidence of how or to what degree they believed the impairment affected him." Id.

Contrary to what Core and Bassignani argue, (see C&B Defs. Br. at 21), a juror may reasonably find that Core perceived Rios as having a disability under the ADA. As stated above, the cited materials provide sufficient evidence to show that Core knew of a "disability" as early as May 1, 2015. (See Pl. Dep. at 26:12–27:2, 49:6–20, 50:2–14, 63:5–25, 79:24–80:6, 149:24–150:9; C&B Defs. 56.1, Ex. V at D-495 to -496; id., Ex. W at D-503; id., Ex. X at D-57; id., Ex. AA, at D-461; id., Ex. BB at D-501; id., Ex. CC at D-317 to -318; Bassignani Email I at D-29.)

Moreover, Core and Bassignani fail to prove that they are entitled to summary judgment with respect to the so-called "transitory and minor" exception. Rios may not base their perceived disability claim upon "impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B). Core

and Bassignani must prove the "transitory and minor" exception as a defense. See 29 C.F.R. § 1630.15(f). They "must demonstrate that the impairment is both 'transitory' and 'minor.'" Id. (emphasis added). The ADA defines a "transitory" impairment as one "with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). Core and Bassignani argue—and Rios concedes—that he largely recovered from his heart condition within a month after his surgery. (See, e.g., Pl. Dep. at 125:11–126:22.)

However, Core and Bassignani in their initial brief do not argue that Rios' health condition was minor. (See C&B Defs. Br. at 21.) In their reply, they contend that, "[a]s a matter of law, where a condition is fully healed within a short period, the condition is both transitory and minor." (C&B Defs. Reply at 11.) "Arguments made for the first time in a reply brief need not be considered by a court." Playboy Enters., 960 F. Supp. at 720 n.7.

Even if the argument were considered, the Court would reject it. The Court recognizes that Core and Bassignani's sole supporting case, Zick v. Waterfront Commission of New York Harbor, No. 11-CV-5093 (CM), 2012 WL 4785703 (S.D.N.Y. Oct. 4, 2012), appears to hold that a transitory impairment—one that had an "expected duration" of no more than 10 weeks— necessarily is "minor" under the ADAAA, see id. at *5. To the extent that it does, Zick is inconsistent with the EEOC's regulation, which expressly distinguishes between a transitory impairment and a minor one. See 29 C.F.R. § 1630.15(f) (noting that the defendant "must demonstrate that the impairment is both 'transitory' and 'minor'"). "[E]ven if the summary judgment record indicated that the injury was [transitory], [Core and Bassignani] must also show, for purposes of th[e] motion, that there is no genuine issue of material fact that the injury was also" minor. Sherman v. Cty. of Suffolk, 71 F. Supp. 3d 332, 346 (E.D.N.Y. 2014). Here, Core and Bassignani fail to show the absence of a genuine issue because the record shows, among other

things, that Rios still attends monthly visits with his doctor and has a pacemaker.[27] (Pl. Decl. ¶¶ 9, 10.) Accordingly, the Court denies summary judgment on the "transitory and minor" exception.

### C.    Legitimate, Nondiscriminatory Reason

Core and Bassignani further defend against the ADA claims by asserting that "Core did not hire Rios because it had no authority to do so," and that "the Port Authority has final authority regarding the number of employees at the Core worksite." (C&B Defs. Br. at 22.) As stated above, the employer must "articulate a non-discriminatory reason for the adverse employment action," and the employee in response must "produce evidence capable of carrying the burden of persuasion that the employer's action was at least in part motivated by discrimination." Davis, 804 F.3d at 235. The nondiscriminatory reason is flawed for the same reasons that the Court states in its FMLA section above. See supra Section I(E). Having considered all of Core and Bassignani's ADA arguments, the Court therefore finds summary judgment in favor of them for the actual disability claims and denies summary judgment for the perceived disability claims.

### III.    NYCHRL

Because the Court denies summary judgment on the FMLA and ADA perceived disability claims, the Court rejects Core and Bassignani's argument that it should decline to exercise supplemental jurisdiction over the NYCHRL claims, which implicate similar facts. (See C&B Defs. Br. at 24–25.) Accordingly, the Court turns to the merits arguments.

Core and Bassignani contend that (1) Rios fails to rebut their nondiscriminatory reason as a matter of law, and that (2) he fails to offer any evidence of a "disability" under the NYCHRL. The Court easily rejects the first argument for the same reasons stated in the FMLA section

---

[27] In determining whether Rios' condition is minor, the jury reasonably may consider the fact that he requires a pacemaker, even though it arguably mitigates the condition. Cf. 29 C.F.R. § 1630.2(j)(vi) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures.").

above.[28] See supra Section I(E). For the reasons set forth below, the Court denies the second argument as well.

In 2005, the New York City Council amended the NYCHRL to create exceedingly lenient standards for litigants to sue for discrimination.[29] See Mihalik v. Credit Agricole Cheuvreaux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). The Court "must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" Id. (quoting Albunio v. City of N.Y., 945 N.E.2d 135, 137 (N.Y. 2011)); see also N.Y.C. Admin Code § 8-130. Even if "the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards," because federal and state civil rights statutes serve only "as a floor below which the [NYCHRL] cannot fall." Mihalik, 715 F.3d at 109 (emphasis in original). To prove his case, Rios "need only show differential treatment—that [he] is treated 'less well.'" Id. at 110. Moreover, because "discrimination shall play no role in decisions relating to employment," discrimination need be only "one of the motivating factors for the defendant's conduct." Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 40 n.27 (1st Dep't 2009).

Rios has asserted discrimination, interference, aiding and abetting, and attempt claims under the NYCHRL.[30] (See Am. Compl. ¶¶ 82–93.) In relevant part, the municipal statute makes

---

[28] Although a defendant may proffer nondiscriminatory reasons at summary judgment to defeat an NYCHRL claim, the Court may not find in the defendant's favor unless "no reasonable jury could conclude either that the . . . 'reasons were pretextual,' or that . . . its conduct was based at least 'in part on discrimination.'" Chen v. City Univ. of N.Y., 805 F.3d 59, 75–76 (2d Cir. 2015) (quoting Melman v. Montefiore Med. Ctr., 946 N.Y.S.2d 27, 35 (1st Dep't 2012)).

[29] In 2016, the New York City Council amended the NYCHRL again "to clarify its intent to foster jurisprudence 'maximally protective of civil rights in all circumstances.'" Makinen v. City of N.Y., 857 F.3d 491, 495 (2017) (quoting N.Y.C. Local Law No. 35, at § 1 (Mar. 28, 2016)).

[30] Rios did not assert a retaliation claim under the NYCHRL. See id. § 8-107(7); (see also Am. Compl.).

the following acts "unlawful discriminatory practice[s]": (1) "refus[ing] to hire or employ" anyone, "bar[ring]" anyone, "discharg[ing]" anyone "from employment," or "discriminat[ing] against" anyone "in terms, conditions[,] or privileges of employment" "because of the [person's] actual or perceived . . . disability"; (2) "coerc[ing], intimidat[ing], threaten[ing,] or interfer[ing] with"—or "attempt[ing] to coerce, intimidate, threaten[,] or interfere with"—any person in the exercise or enjoyment of" NYCHRL rights; or (3) "aid[ing], abet[ting], incit[ing], compel[ling,] or coerc[ing]"—or "attempt[ing]" to aid, abet, incite, compel, or coerce—"the doing of any of the acts forbidden" by the NYCHRL. N.Y.C. Admin. Code §§ 8-107(1)(a), 8-107(6), 8-107(19). In relevant part, the statute defines "disability" as "any physical, medical, mental or psychological impairment," which means "an impairment of any system of the body[,] including, but not limited to[,] . . . the cardiovascular system . . . ." Id. §§ 8-102(16)(a)–(b).

Unlike with the ADA claims, Core and Bassignani do not challenge Rios' NYCHRL claims predicated on perceived disability. On this ground alone, the Court may deny summary judgment. Still, the Court also rejects their argument that Rios fails to show actual disability under the NYCHRL. Citing a pre-2005 First Department case, they assert that he "had no physical, mental or medical impairments resulting from his heart condition that prevent[ed] the exercise of his normal bodily functions." (C&B Defs. Br. at 23.) However, the New York City Council has now made clear that it wanted broad anti-discrimination protections within the city limits. See Mihalik, 715 F.3d at 109. And under the NYCHRL, Rios need not show the "prevent[ion]" of the "exercise of his normal bodily functions," which is a requirement for a claim under the NYSHRL, see N.Y. Exec. Law § 292(21)(a).[31] Here, Rios must prove only "an impairment of . . . the cardiovascular

---

[31] Moreover, unlike actual disability under the ADA, an actual disability under the NYCHRL need not "substantially limit [Rios'] normal activities." Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 155 (2d Cir. 1998), superseded by statute in part on other grounds, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (codified in scattered sections of 29 and 42 U.S.C.); see also Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278

system," such as the existence of OCAD. N.Y.C. Admin. Code § 8-102(16)(b). The cited materials provide sufficient evidence for a reasonable juror to find that Rios had a heart condition requiring surgery. The Court therefore denies summary judgment on the NYCHRL claims.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Core and Bassignani's joint motion for summary judgment. The FMLA, ADA perceived disability, and NYCHRL claims may proceed to trial. The Court finds summary judgment in favor of Core and Bassignani with respect to the ADA actual disability claims. The Court also respectfully DIRECTS the Clerk of Court to amend the caption as reflected in this Memorandum and Order. The Court further ORDERS the parties to submit a joint pretrial order no later than April 25, 2018. The Court respectfully REFERS the proposed order to the Honorable James Orenstein, United States Magistrate Judge, for review.

SO ORDERED.

Dated: March 28, 2018
      Brooklyn, New York

                                 s/Carol Bagley Amon

                                 Carol Bagley Amon
                                 United States District Judge

---

(2d Cir. 2009) (noting that the NYCHRL is a "one-way ratchet" because interpretations of similar federal civil rights statutes serve only as a "floor").